IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TODD C. HERBERG,

           Plaintiff,

                               Case No.  04-CV-1035-ST

     v.

NORTHWEST REGIONAL EDUCATION        FINDINGS AND
SERVICE DISTRICT, a political subdivision of    RECOMMENDATION
the State of Oregon and a public body corporate,
SALLY BUNNELL, HARRY HEWITT, CANDACE
M. COLE, MARILYN MCGLASSON, KENDA
SHOEMAKER, and GAIL YOUNG,

           Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Todd Herberg ("Herberg"), complains that his former employer, Northwest

Regional Education Service District ("the District"), and six members of the District's Board of

Directors (Sally Bunnell, Harry Hewitt, Candace M. Cole, Marilyn McGlassen, Kenda

Shoemaker and Gail Young) allegedly disclosed incomplete, false and misleading information concerning his expenditures to the media and to an accounting firm. He alleges the following claims:

First Claim: against all defendants for violating 42 USC § 1983 based on a denial of procedural due process;

Second Claim: against all defendants for violating 42 USC § 1983 based on a denial of substantive due process;

Third, Fourth and Fifth Claims: against the District for defamation; and

Sixth Claim: against the District for placing him before the public in false light ("Sixth Claim").

This court has jurisdiction over Herberg's constitutional claims under 28 USC § 1331 based on federal question jurisdiction and under 28 USC §1343 based on civil rights jurisdiction. This court also has jurisdiction over Herberg's supplemental state law claims pursuant to 28 USC § 1367(c).

Defendants have filed a Motion for Summary Judgment (docket #28) against all of Herberg's claims. For the reasons that follow, the motion should be granted only as to the Second Claim and otherwise denied.

## STANDARD

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving

party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989). The Ninth Circuit has "a high standard for the granting of summary judgment in employment discrimination cases. Most recently we explained that 'we require very little evidence to survive summary judgment' in a discrimination case, because the ultimate question is one that can only be resolved through a "searching inquiry" - one that is most appropriately conducted by the fact finder upon a full record." *Schnidrig v. Columbia Machine, Inc.,* 80 F3d 1406, 1410 (9th Cir), *cert denied*, 516 US 1171 (1996).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574 (1986). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*.

**UNDISPUTED MATERIAL FACTS**

From July 1, 1999, through June 30, 2003, Herberg was employed as the Superintendent of the District. The District is one of Oregon's largest Education Service Districts, and serves 20 school districts in Columbia, Clatsop, Tillamook and Washington counties. More than 107,000 students reside in the four-county region.

Herberg's employment contract required the District to reimburse him for expenses incurred within budget and within the scope of his employment and authorized him to use District credit cards for those expenses, including lodging, food and travel. *Ex. 27, § 11.* The District was also required to provide Herberg with a vehicle, insurance and all operating expenses. *Id, § 14.* Herberg regularly reported his expenses to the Board. *Ex. 63; Jones Depo., pp. 56-58.* By the terms of Herberg's employment contract, the Board was required to "promptly inform him of any comments, questions or concerns related to such expenditures." *Ex. 27, § 11.*

On April 30, 2003, Herberg and the District entered into a Separation Agreement which provided that Herberg would continue to be employed by the District through the end of the fiscal year (June 30, 2003), but would not work in the District's office. The Separation Agreement was approved by the District's Board on April 29, 2003. *Ex. 95.* On April 30, 2003, the District's Deputy Superintendent, Bud Moore ("Moore"), notified the Central Management Team of the Separation Agreement and reviewed a press release drafted by Board Chair Gail Young ("Young"). *Ex. 142.* The press release issued on April 30, 2003, stated that the Board and Herberg both agreed that the District "would benefit from a different leadership direction in light of changing priorities brought about by the dramatic reduction in the District's resources over the last year." *Ex. 2.*

As a result of the April 30, 2003 press release, Paige Parker ("Parker"), a reporter from THE OREGONIAN, contacted the District and spoke with Moore in preparation for an article which appeared in THE OREGONIAN on May 1, 2003. *Ex. 3.* As Parker later told Herberg, someone from the District encouraged her to review Herberg's financial records. *Herberg Depo., p. 91.*

On May 6, 2003, Parker went to the District offices and reviewed financial documents pertaining to Herberg. *Moore Depo., pp. 79-81.* Parker subsequently confirmed by email that Moore had provided her access to "Herberg's expense records this afternoon" and requested additional documentation, including a list of all administrators and Board members who traveled out-of-district in the last two years with destination and reason for travel. *Ex. 76.* On May 7, 2003, Moore communicated Parker's request to Jerry Jones ("Jones"), Assistant Superintendent of Finance Operations, Tim Collier ("Collier"), Executive Director of Fiscal Services, and Nancy Young ("Young"), Executive Assistant to the Board and Superintendent. *Ex. 143.*

On May 12, 2003, Moore responded to Parker about most of her May 7 requests, but did not respond to her request for Board members' and administrators' out-of-state travel records. *Ex. 97.* Collier looked at the documents that were provided to Parker for review and does not recall seeing any board members' travel and reimbursement records. *Collier Depo., pp. 56-57.* Sally Bunnell ("Bunnell") recalled reviewing some of the documents gathered for Parker's review. *Bunnell Depo., pp. 16-19.* No record was kept by the District of what documents were provided to Parker for review.

Herberg's employment terminated June 30, 2003, pursuant to the terms of the Separation Agreement.

Within a month after Herberg's employment ended, Young engaged the firm of Talbot Korvola & Warwick LLP ("TKW") to perform "an agreed upon procedures" review of Herberg's expenditures "for the purpose of determining whether certain expenditures incurred by [Herberg] were in accordance with Board and District policies for the period July 1, 2001 through March 31, 2003." *Ex. 36, p.1; Gail Young Depo., pp.136-138.* The engagement letter advised the District that "the sufficiency of these procedures is solely the responsibility of the District." *Ex. 36, p.1.* It added that the "procedures included in the attachment to this letter do not constitute an audit" and that it "is intended solely for the use of the District and should not be used by those who have not agreed to the procedures." *Id.*

On July 28, 2003, Young met with Parker. A day later, the District issued a press release stating that the District "has become aware of some questions regarding the expenditures within the agency as a result of recent inquiries from the media. These questions relate primarily to the credit card use by the District's former Chief Executive Officer during the past four years." *Ex. 6.* The press release also mentioned Herberg by name and stated that the District was reviewing its policies and procedures regarding oversight of spending in light of inquiries from the media. *Id.*

In an email to the District staff dated July 29, 2003, Lori Bettineski ("Bettineski"), the District Communications Specialist, reported that "the Board is concerned about the potential negative impact such news could have on our agency and the districts we serve. As a result, we are being proactive in sharing what we are doing to ensure that appropriate safeguards and oversight are in place for the future." *Ex. 147.* Assistant Superintendent Jones suggested

contacting the District's lobbyists by phone "to discuss our concern and attempt to reduce damage control at the legislature." *Ex. 145.*

On July 30, 2003, THE OREGONIAN published an article written by Parker, entitled "Agency Will Audit Spending of Ex-Chief." *Ex. 7.*

In anticipation of the publication of Parker's article in THE OREGONIAN, Young contacted William Barker, a senior manager at TKW, the District's accounting firm, to determine whether Herberg's expenditures complied with the District's policies. *Gail Young Depo., pp. 136-41*; *Barker Depo., pp. 10-12.* Young signed the engagement letter on July 30, which Jones re-executed on August 6, 2003. *Ex. 77*; *Jones Depo., pp. 75-76.* On July 31, 2003, Barker made arrangements for two TKW employees, Chris Jensen and Adam Otte, to perform the work at the District offices, while also requesting that Jones gather all the documentation related to the procedures to be performed. *Ex. 174.* On August 8, 2003, TKW completed work on the "agreed upon procedures" review, and a draft of the report included the statement that "we were not engaged to and did not conduct an audit." *Ex. 37, p.4.*

TKW sent its draft report to the District on August 14, 2003. *Ex. 106, Barker Depo. p. 64.* The draft was to be reviewed by the Board at a work session scheduled for August 18, 2003, although the record is unclear whether this review occurred. *Ex. 40.* District administrators Jones and Collier also reviewed the draft report. *Collier Depo., p.86; Jones Depo., p. 109.* On August 20, 2003, TKW signed the final version of the report and sent it to the District. *Ex. 108.* The report indicates that TKW discussed District policies and/or procedures with Jones, Collier and Nancy Young, and as a result of those discussions, TKW "determined the District had an unwritten policy that specified the District incurred [sic] charges for per diem and

hotel charges would be based upon Internal Revenue Service guidelines for specific cities."
*Ex. 9, pp. 1-2.* On August 21, 2003, the TKW report was faxed to reporters, including THE
OREGONIAN and THE WENATCHEE WORLD, the newspaper in the area where Herberg had
previously resided. *Exs. 129 & 131; Bettineski Depo., pp. 72-77, 80.*

Young requested the District staff to issue a press release. *Ex. 151.* The August 23, 2003
press release, prepared by Bettineski and Moore, stated that the TKW had been completed an
"independent audit" to determine whether Herberg had complied with Board and/or District
policies and procedures from July 2001 through March 2003 and that a financial oversight
committee created by the Board two months earlier had reviewed the audit "extensively" and
would forward recommendations to the Board. *Ex. 10 & 151; Bettineski Depo., pp. 82-84;*
*Collier Depo., pp. 17, 100-01; Otte Depo., pp. 40-41.*

Dave Anderson, a reporter for THE OREGONIAN, then prepared an article which was
published both in print and electronically on August 26, 2003. *Exs. 12 & 73.* This article stated
that an audit committee had made recommendations to the District's Board "in the wake of an
outside auditor's report that showed that former Superintendent Todd Herberg" made unjustified
expenditures, some in excess of IRS guidelines, with which Herberg "took issue." *Id.* It also
stated that the District had "terminated Herberg's contract in April" followed immediately by the
sentence: "After THE OREGONIAN obtained Herberg's credit card records, the board announced
it would hire a consultant to audit them." *Id.* Additional articles were published which criticized
Herberg as late as November 19, 2003. *Ex. 17.*

Beginning September 12, 2003, Herberg provided information to THE OREGONIAN in an
effort to obtain a retraction or a renewed investigation into the articles about his spending. *Exs.*

*14, 15, 16, 18 & 19; Herberg Depo., pp. 167-71.* Upon review, THE OREGONIAN declined to

retract the story, stating that "we do not see any specific factual error that needs correcting." *Ex.*

*16.*

On December 2, 2003, Herberg made a public records request for the documents he

believed had been reviewed by Parker and TKW. *Ex. 87.* On December 2, 2003, Moore wrote

to Herberg with the estimated cost of complying with his request. *Ex. 88.* At the time Herberg

requested the records, the Board had in place a public records policy which was changed by the

Board on February 24, 2004. *Exs. 161 & 91.* The new policy provided conditions to ensure "the

safety and well-being of the records," and provided that the Board may waive fees producing

copies of the records if in the interest of the general public. *Ex. 161.* THE OREGONIAN was not

charged for staff time for its review of the District records. *Nancy Young Depo., p. 90.* By

comparison, Herberg was charged for staff time for his review of District records. *Ex. 88.*

Some of the documents requested by Parker in May and June 2003 regarding other

district administrators and Board members were not obtained by the District from third parties

until February 2004, namely the Driftwood Shores travel in July/August 2001, the St. Louis

Hotel in New Orleans, and the April 2002 NSBA Conference invoices for Herberg and

defendants Bunnell and Shoemaker. *Exs. 66 & 168, p.2.* During the fiscal year 2001-02,

Herberg's expenses for in-district and out-of-district travel, conference and registration fees were

within budget.

///

///

///

<u>**ANALYSIS**</u>

**I.** <u>**First Claim - Procedural Due Process**</u>

Herberg's First Claim contends that he has a "liberty interest in his reputation and honesty, fairness and competence." Amended Complaint, ¶ 21. He further alleges that "the information published by defendants" to THE OREGONIAN reporters and to TKW was "false and misleading" and intended to embarrass and humiliate him by "calling into question his integrity, professionalism, competency and reputation for honesty, fairness and competence." *Id*, ¶ 22. Defendants did not provide him "with any pre- or post-termination right to a hearing before an impartial decision maker, with the right to present evidence and cross-examine witnesses in connection with false and misleading information." *Id*, ¶ 23. As a result, he alleges that he has been unable to find other employment and suffered damages. *Id*, ¶¶ 24-25.

Defendants seek summary judgment against the First Claim on the basis that Herberg cannot prove any protected right was violated. Alternatively, the individual defendants seek summary judgment on the basis of qualified immunity and insufficient personal participation.

**A.** <u>**Legal Standard**</u>

The Fourteenth Amendment protects a person from deprivations of property or liberty without procedural due process. *Board of Regents of State Colleges v. Roth,* 408 US 564, 569 (1972). Deprivation by state action of a constitutionally protected liberty interest is not itself unconstitutional. "[W]hat is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinernon v. Burch*, 494 US 113, 125 (1990) (emphasis in original) (citations omitted). "The liberty protected by the due process clause of the fifth and fourteenth amendment encompasses an individual's freedom to work and earn a living." *Bollow v. Federal Reserve*

*Bank of San Francisco*, 650 F2d 1093, 1100 (9th Cir 1981), *cert denied,* 455 US 948 (1982). A due process violation involves a two-part inquiry: whether the plaintiff was deprived of a constitutionally protected interest, and if so, what process the plaintiff was due. *Logan v. Zimmerman Brush Co.*, 455 US 422, 428 (1982).

Constitutional claims based on defamatory statements are limited. Interests come within the meaning of "liberty" or "property" either because they are guaranteed in a provision of the Bill of Rights which has been incorporated into the Fourteenth Amendment or "by virtue of the fact that they have been initially recognized and protected by state law." *Paul v. Davis*, 424 US 693, 710-711 (1976), *rehearing denied* 425 US 985 (1976). A defamatory statement of a public official which harms *reputation alone* "is quite different from" and "does not result in the deprivation of a 'liberty' or 'property' interest" sufficient to invoke deprivation of a constitutionally protected interest. *Id* at 711-12. *Also see Siegert v. Gilley*, 500 US 226 (1991), *rehearing denied,* 501 US 1265 (1991).

Instead, in the Ninth Circuit, a person, such as Herberg, who alleges harm to reputation by a defamatory statement by a public official must satisfy a four-part "stigma plus" test by proving that: (1) "the state makes a charge against [a plaintiff] that might seriously damage his standing and associations in the community;" (2) "the accuracy of the charge is contested;" (3) "there is some public disclosure of the charge;" (4) the charge "is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Wenger v. Monroe*, 282 F3d 1068, 1074 (9th Cir 2002), *citing Llamas v. Butte Community College Dist.,* 238 F3d 1123, 1129 (9th Cir 2001).

**B. Whether Herberg has a Constitutionally Protected Liberty Interest**

**1. Whether a Charge was Made**

A "charge" of "dishonesty" or "immorality" may seriously damage the "standing and associations" of an individual in the community. *Roth,* 408 US at 573. Similarly, "[a]llegations that exclude a person permanently from a profession may warrant procedural protection." *Roley v. Pierce County Fire Prot.,* 869 F2d 491, 496 (9th Cir 1989), *citing Roth v. Veteran's Admin. of Gov't of U.S.,* 856 F2d 1401, 1411 (9th Cir 1988). On the other hand, mere claims of incompetence or inability to get along with others are not within the scope of the liberty interest. *Roley,* 869 F2d at 495 (citations omitted).

Relying on *Brady v. Gebbie,* 859 F2d 1543 (9th Cir 1988), *cert denied,* 489 US1100 (1989), Herberg contends that the July 29 and August 23, 2003 press releases and the information contributed to the newspaper articles and TKW implicated his reputation for honesty. In *Brady*, a public official accused the plaintiff of dishonesty and immorality "through his systematic 16-year diversion of public funds" and violation of "public trust of confidence" in the proposed letter of termination and press releases. Id at 1546-47. Similarly, this court concludes that defendants charged Herberg with dishonesty and/or immorality in certain statements.

**a. July 29, 2003 Press Release**

In its July 29, 2003 press release, the District does not directly accuse Herberg of dishonesty or immorality. Instead, it acknowledges that it "has become aware of some questions regarding expenditures within the agency as a result of recent inquiries from the media. These questions relate primarily to the credit card use by the district's former chief executive officer

during the past four years." *Ex. 6.* The District then states that it is "reviewing all policies and procedures to ensure that the Board's expectations are clear and to provide for increased oversight." *Id.* Board Chair Young is quoted to say that "it is our responsibility to ensure that every cent is spent wisely and that board procedures and policies are followed precisely at all times." *Id.* The District acknowledges that Herberg's expenditures were reported to the Board on a monthly basis, then pledges a new oversight system to monitor expenses more closely. *Id.* The press release continues with a blurb about Herberg and the Board's April 2003 joint agreement that "the district would benefit from a different leadership direction," and concludes with news of the selection process for a new superintendent. *Id.*

Nothing in that press release literally accuses Herberg of anything. However, the questions relating to Herberg's credit card use and his termination are impliedly tied together by their proximity in the press release and by the Board's failure to clarify that Herberg's termination had nothing to do with his credit card expenditures. A reasonable person could read the press release to include a charge of dishonesty or immorality against Herberg. Viewing the July 29, 2003 press release in the light most favorable to Herberg, the non-moving party, this court finds a genuine issue of material fact exists as to whether it contains a charge.

### b. Information Contributed to TKW Report

The District hired TKW to review Herberg's expenditures and compare them to District policies with the knowledge that the report would be made public. The TKW report expressed no direct opinion on whether Herberg violated Board and District policies relating to expenses he incurred or approved. Instead, it states that "our testing resulted in the following instances in which Board and/or District policies may not have been followed," then lists a number of

expenses. *Ex. 9.* After interviewing Jones, Collier and Nancy Young, the TKW report concludes that "the District had an unwritten policy that specified that District incurred charges for per diem and hotel charges would be based upon Internal Revenue Service guidelines for specific cities." *Id.* Based on the documents provided by the District, TKW then developed a table comparing nine lodging expenses of Herberg, other District individuals, and IRS guidelines. *Ex. 9.* The table shows that all of Herberg's expenses surpassed the IRS guidelines.

There is no dispute that, contrary to TKW's statement, the District did not utilize IRS guidelines. *Ex. 165; Herberg Depo., p. 144; Collier Depo., p. 85; Jones Depo., pp. 87-88; Shoemaker Depo., p. 45.* According to its report, TKW obtained its false information from Jones, Collier and Nancy Young. In addition, Herberg has submitted evidence that the District withheld some documents from TKW which pertained to the comparison of expenses by Board members and administrators. *Plaintiff's Response to Defendants' Concise Statement of Material Facts*, ¶ 33. As a result, the TKW report was inaccurate, yet published and then used by the District as the basis for newspaper articles. By contributing inaccurate information to TKW, the District set in motion the release of information to the public about Herberg's allegedly improper expenses. This is sufficient to qualify as making a public charge.

### c. August 23, 2003 Press Release

The District's August 23, 2003 press release indirectly accuses Herberg of dishonesty and moral turpitude. It informs that the District had requested an "independent audit" to be conducted about whether any incidents of noncompliance with its policies or procedures relating to expenditures were made or approved by Herberg. *Ex. 10.* The release takes advantage of the legally-charged word "audit," although the TKW report does not include the word. In fact, in a

July 28, 2003 letter to Board Chair Young, TKW makes it clear that the report would not be an

audit:[1]

> [W]e were not engaged to and did not conduct an examination, the
> objective of which would be the expression of an opinion on whether there
> were any instances of noncompliance with the Board and District policies
> and procedures relating to expenditures incurred by or approved on behalf
> of the District by its former Superintendent and Clerk, Dr. Todd C.
> Herberg for the period July 1, 2001 to March 31, 2003. *Accordingly, we
> do not express such an opinion.*

*Ex. 36.* (emphasis added).

The August 23, 2003 news release then lists a series of recommendations stemming from

the so-called "audit" of the expenditures approved or incurred by Herberg, among them that "no

transaction shall exceed $200 without approval from the District's Executive Director of Fiscal

Services, and no credit card will be used to supplant or circumvent other District purchasing

procedures." *Ex. 10.* This statement leaves the reader with the impression that Herberg was

somehow involved in "supplanting" or "circumventing" District purchasing procedures, which,

read in the light most favorable to Herberg, questions his honesty and morality.

### d. Communications with the Media

Herberg also alleges that the individual defendants and representatives of the District

contributed information which appeared in articles in THE OREGONIAN and cast him in a

negative light. Defendants provided access to documents relating to the superintendent's

---

[1] The press release contains another inconsistency, namely the suggestion for "possible
expansion of IRS guidelines beyond those currently in place for meal reimbursement" (*Ex. 10*),
which is at odds with the TKW report's finding that the District already had an "unwritten
policy" for travel (hotel and per diem) expenses to be based on IRS guidelines for travel to
certain cities. *Ex. 9.*

expenditures to Parker at her request. Herberg concedes that providing documents to Parker may

not, in and of itself, be considered a public charge.

However, individual defendants also made specific statements made to the reporters

which were then published in THE OREGONIAN. The July 30, 2003, article authored by Parker

paraphrased defendants' words as follows:

> [Young] says board members did not learn of Herberg's spending until they
> terminated him one year into his second three-year contract and did not review
> his record until The Oregonian requested them.

> [Moore said] the agency paid [Herberg] more than $500 a day for 41 days he did
> not work.

> Young said the audit begins Monday, with a report due Aug. 18.

> Young would not comment on whether she considered Herberg's purchases
> appropriate, but said the board has formed a committee that will suggest new
> rules.

> [Young] also said Herberg has been asked to return the three days of pay other
> administrators gave up.

> After approving Herberg's first contract in 1999, Young said no one examined
> Herberg's spending or asked him to limit it.

> [As the Legislature sliced money from schools this year, other districts put the
> brakes on travel.] There was no moratorium at the service district, Moore said.

> Herberg's $173,000 deal came out of the general fund, Young said. She said staff
> members were not laid off to pay for it.

Furthermore, Young is directly quoted as saying: "The board is concerned about the

information that has surfaced, Young said. As a public agency, it is our responsibility to ensure

that every cent is spent wisely and that board procedures and policies are followed precisely at

all times." *Ex 7.*

The August 26, 2003 article authored by Anderson paraphrased defendants' words as follows:

> The proposed level of scrutiny is unusual for school and education districts in Oregon, but it could become a trend, said [Young].
>
> Young said she would not comment on Herberg's spending. She acknowledged there were gaps in the board's oversight of the superintendent, but said its job is not to look at electricity bills and other daily operations.
>
> However, Young said, she thinks the ESD's problems could be a lesson for other school and service districts.

Young also was directly quoted: "Boards mandate policy, Young said. They don't look at day-by-day-by-day expenses." *Ex 73.*

The record does not contain any evidence to assess the accuracy of the paraphrased statements. However, taken as true for the purpose of this summary judgment motion, the statements to THE OREGONIAN could be interpreted as attacking Herberg's honesty and, thus, constitute charges.

## 2. <u>Whether the Accuracy of the Charges is Contested</u>

Herberg contested and vehemently denied the charges of incompetence and dishonesty included in the July 29 and August 23, 2003 press releases, TKW report, and THE OREGONIAN articles. Herberg was assured by the District that he would have an opportunity to rebut the TKW report before the findings were made public. *Herberg Depo., pp. 172-73; Brown Decl. ¶¶ 3-4.* He also tried to obtain a retraction from THE OREGONIAN and/or a renewed investigation on the matters of his spending while he served as superintendent. *Exs. 14, 15, 16, 18, 19; Herberg Depo., pp. 167-71.* These acts clearly qualify as contesting the accuracy of the charges.

### 3. **Whether the Charges were Publicly Disclosed**

Defendants do not deny that all the allegedly defamatory statements were publicly distributed.

### 4. **Whether the Charges Were Made in Connection with the Termination of Employment**

The Ninth Circuit has rejected a bright-line rule that "post-termination statements cannot form the basis of a due process violation" and adopted a flexible interpretation to the requirement that the charge be made "in the course of termination." *Campanelli v. Bockrath*, 100 F3d 1476, 1482 (9th Cir 1996). The critical inquiry is whether the "defamatory statements are so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." *Id*. This requires "some temporal nexus between the employer's statements and the termination." *Id* at 1483. In *Campanelli*, a seven-to-nine day interval between the termination date and the publication of the defendants' statement constituted a sufficient temporal nexus to survive the defendants' motion to dismiss.

However, a "strict temporal link" is not necessary. *Ulrich v. City and County of San Francisco*, 308 F3d 968, 983 (9th Cir 2002). In *Ulrich*, a defamatory report was filed five days after an employee's staff privileges were terminated. Relying on the test in *Campanelli*, *Ulrich* focused not only on the temporal nexus, but also on the stigmatization of the discharge itself. Plaintiff was a doctor who, soon after protesting against certain hospital layoffs, received notice that he was being investigated by the hospital for professional incompetence. He resigned, then attempted to rescind his resignation which the hospital refused. As required by statute, a hospital official filed a report with the National Practitioner Data Bank, suggesting that plaintiff had resigned because he was guilty of the charges levied against him in the investigation. The court

found "such an implication had the potential to make the resignation itself stigmatizing in the eyes of potential employers – an effect that would have been avoided if [the employer representative] had accepted [the plaintiff's] rescission of resignation." *Id* at 983. Thus, the nexus test was met.

An examination of cases outside the Ninth Circuit offers little guidance as to the required temporal nexus. The Eleventh Circuit in *Ray v. Tennessee Valley Authority, et al.*, 677 F2d 818, 824 (11th Cir 1982), *rehearing denied*, 683 F2d 1375 (1982), *cert denied*, 459 US 1147 (1983) found that six years was long enough to destroy the temporal nexus. However, the person who made the statement was not connected to the employer's personnel department, making it unlikely the public would perceive the defamation as connected to the official termination. The Seventh Circuit in *Hadley v .County of Du Page, et al.*, 715 F2d 1238, 1246-47 (7th Cir 1983), *cert denied*, 465 US 1006 (1984) held that defamatory statement must occur "at or near the time of [the plaintiff's] termination" to give rise to a liberty interest requiring a due process hearing, and that a statement made almost two years after the termination does not satisfy the requisite nexus. The Sixth Circuit in *Mertik v. Blalock*, 983 F2d 1353, 1363 (6th Cir 1993), held that defamatory statements made "roughly contemporaneously" with a deprivation of the right are enough to meet the stigma plus test. It interpreted *Siegert* to hold that "the loss must occur at the same time as the claimed stigmatizing publication" (*id*), an interpretation that *Campanelli* rejected as too narrow.

Herberg's effective termination date was June 30, 2003. This is the relevant date for purposes of the stigma plus test, and not the date the Separation Agreement was signed. *See Ulrich,* 308 F3d at 983. The dates of the press releases are July 29 and August 23, 2003, while

the information upon which the TKW report was based was provided between July and August 2003. Defendants made statements to THE OREGONIAN before the July 30, 2003 and August 26, 2003 publication dates, some of which were probably made before Herberg's effective date of termination. Therefore, the interval between Herberg's termination and the public charges were one to two months, which is longer than the interval in *Campanelli* and *Ulrich*, but much shorter than in *Ray* and *Hadley.*

Defendants point to *Siegert v. Gilley*, 500 US 226, 234 (1991), *rehearing denied,* 501 US 1265 (1991), which involved a three week interval, similar to the interval at issue here. *Siegert* held that "the alleged defamation was not uttered incident to the termination of Siegert's employment . . . since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later." *Id* at 234. However, *Siegert* heavily relied on the voluntary nature of the plaintiff's discharge. Clearly a voluntary resignation greatly lessens the potential for the discharge to become stigmatizing in the eyes of others. *Ulrich* similarly distinguishes *Siegert*, pointing to the difference between a voluntary resignation and a failure to rehire. *Ulrich,* 308 F3d at 982. In contrast, Herberg was subject to involuntary termination.[2] Thus, *Siegert* is not particularly helpful.

Because the standard is flexible, with no strict temporal nexus, a jury should decide whether the statements made by the District before and within one to two months after Herberg's

---

[2] Herberg alleges he did not voluntarily resign, but was faced with termination from employment. Although defendants contend the resignation was voluntary because both sides agreed the District would benefit from a different leadership style, signed a Separation Agreement and Release on April 30, 2003 (*Ex. 1*), and made the Herberg's resignation public the same day (*Ex. 2*), the facts are construed in the light most favorable to the non-moving party. For purposes of this motion, Herberg's termination will be considered involuntary.

termination sufficiently link his termination with charges of financial dishonesty so as to make the termination stigmatizing in the eyes of a reasonable person. Therefore, unless an affirmative defense applies, Herberg has submitted sufficient evidence to satisfy the stigma plus test.

**C.** **Affirmative Defenses Against Individual Liability**

Defendants contend that all the individual defendants are entitled to summary judgment on the basis of qualified immunity, or alternatively, all individual defendants except Gail Young should be granted summary judgment due to insufficient personal participation.

**1.** **Whether Qualified Immunity Applies**

Defendants argue that they are entitled to qualified immunity because in 2003 when Herberg was terminated, a public official in their position could have reasonably believed that their actions were lawful. They contend that they issued no defamatory statements, provided accurate and complete information to the media, and clearly communicated the true reasons for Herberg's termination.

The doctrine of qualified immunity insulates government agents from personal liability for money damages in actions taken in good faith while exercising discretionary authority in their official capacity. *Deorle v. Rutherford,* 272 F3d 1272, 1285 (9th Cir 2001), *cert denied*, 536 US 958 (2002). In a qualified immunity analysis, once a recognized constitutional violation has been alleged, the court must then inquire "whether the right was clearly established" at the time it was alleged to have been violated. *Saucier v. Katz*, 533 US 194, 201 (2001).

As discussed above, whether defendants' actions were lawful is disputed at this juncture. For purposes of summary judgment, this court has found that Herberg presents sufficient issues of fact for a jury to determine whether his due process right was violated by defendants. Thus,

the only issue for qualified immunity is whether defendants' conduct violated a right that was

"clearly established." "Whether at the time of the challenged action the legal norm allegedly

violated by an official was clearly established is a question of law." *Brady*, 859 F2d at 1556,

*citing Mitchell v. Forsyth*, 472 US 511, 528 (1985).

To be "clearly established," "'[t]he contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right.' In other words,

'in the light of pre-existing law the unlawfulness must be apparent.'" *Wong v. INS*, 373 F3d 952,

976 (2004) (citations omitted). "[G]eneral statements of the law are not inherently capable of

giving fair and clear warning" and "a general constitutional rule already identified in the

decisional law may apply with obvious clarity to the specific conduct in question, even though

'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*,

520 US 259, 271 (1997), *quoting Anderson v. Creighton*, 483 US 635, 640 (1987) (alteration in

original). "[W]hat is required is that government officials have 'fair and clear warning' that their

conduct is unlawful." *Devereaux v. Abbey,* 263 F3d 1070, 1074 (2001) (en banc) (citations

omitted). "'[P]recedent directly on point is not necessary to demonstrate' that a right is clearly

established. . . . Rather, if 'the unlawfulness [is] apparent in light of preexisting law,' then the

standard is met. . . . In addition, even if there is no closely analogous case law, a right can be

clearly established on the basis of 'common sense.'" *Giebel v. Sylvester,* 244 F3d 1182, 1189 (9th

Cir 2001) (citations omitted).

In 1985, the Ninth Circuit found the law clearly established that a constitutionally

protected procedural due process liberty interest was implicated when the state made defamatory

statements against an employee during the course of termination, the employee disputed the

accuracy of the charge, the charge was publicly disclosed and the charge was made in connection with termination of employment. *Brady*, 859 F2d at 1556, *citing Jones v. Los Angeles Community College Dist.*, 702 F2d 203, 206 (9th Cir 1983) and *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F2d 773, 777 (9th Cir 1982). Later in 1996 the Ninth Circuit decided *Campanelli* which offered a flexible test as to when a charge is made "in connection with termination." Thus, the law governing defendants' conduct was clearly established in 2003.

If the right is clearly established, then the burden shifts to the defendants to prove that no reasonable government official could have believed that he could deprive Herberg of a liberty interest in this case. This is "essentially a legal question." *See Act Up!/Portland v. Bagley,* 988 F2d 868, 873(1993), *reversed on other grounds by Saucier v. Katz*, 533 US 194 (2001) (citations omitted). Even so, "the underlying conduct is still a factual matter as to which all inferences must be drawn in favor of the party opposing immunity." *Freitas v. Stone*, 818 F Supp 1333, 1337 n3 (D Ha 1993), citing *Act Up!,* 988 F2d at 873. Viewing the evidence in the light most favorable to the party opposing qualified immunity, defendants have not met their burden. A reasonable person could conclude that Herberg's termination and the defendants' statements were closely related to the extent that the termination was stigmatizing. Therefore, no qualified immunity should be granted at this stage of the proceedings.

### 2. Whether the Individual Defendants had Sufficient Personal Participation

All of the individual defendants, except Young, seek summary judgment due to insufficient personal participation in any the alleged deprivation of Herberg's due process right.

Under 42 USC § 1983, individual public officials cannot be sued unless their conduct subjects or causes another to be subjected to the deprivation of rights, by an affirmative act,

participation in another's affirmative act, or omitting to perform an act that he or she is required to do, which then causes the deprivation upon which the complaint is based. *Johnson v. Duffy*, 588 F2d 740, 743 (9th Cir 1978). The causation requirement can be met not only by showing a direct participation in the deprivation, but also by establishing that the public official has set in motion "a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Harris v. Roderick*, 126 F3d 1189, 1196 (9th Cir 1997), *cert denied*, 522 US 1115 (1998), *citing Johnson*, 588 F2d at 743-44.

The evidence reveals that all of the Board members either approved or failed to object to the press releases, newspaper articles, and the publication of the final TKW report. They may not have actually talked to or provided documents to either the newspaper reporters or TKW, but they were certainly aware of the content of the press releases, newspaper articles, and TKW report, yet took no action to correct any misrepresentations or omissions to the public. At this point, the record contains no evidence that one or more Board members actively disassociated themselves in some way from the actions of the Board as a whole. Therefore, construing the facts in favor of Herberg, the individual defendants are not entitled to summary judgment based on insufficient personal participation.

### D. <u>What Procedural Process is Due</u>

"The fundamental requirement of due process is the right to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Elridge*, 424 US 319, 333 (1976) (citations omitted). Where the stigma plus elements are satisfied, the plaintiff is "entitled to notice and a hearing to clear his name." *Bollow v. Federal Reserve Bank*, 650 F2d 1093, 1100 (9th Cir 1981),

*cert denied*, 455 US 948 (1982) (citations omitted).  No notice and opportunity for a hearing to clear his name was provided to Herberg.

### E.  Conclusion

In summary, genuine issues of material fact exist as to whether the defendants' statements damaged Herberg's constitutionally protected interest.  Furthermore, questions of fact exist as to whether defendants are entitled to qualified immunity or to a defense based on insufficient personal participation.  If Herberg has a constitutionally protected interest, then he should have been provided notice and an opportunity for a hearing to clear his name.  The defendants' motion for summary judgment against the First Claim should be denied.

## II.  Second Claim - Substantive Due Process

Herberg's Second Claim alleges that the action by defendants "to publish false and defamatory statements impugning [his] reputation for honesty and fairness without providing [him] an opportunity to refute" them was "made in bad faith with the intent to harm his fundamental rights to privacy and the pursuit of his livelihood."  *Amended Complaint, ¶ 29.*  As a result of being deprived "of the right to a hearing prior to the publication of the false and derogatory statements," Herberg seeks damages.  *Id, ¶ 30.*

Defendants seek summary judgment against the Second claim because Herberg has no liberty interest in his reputation.  In the alternative, the individual defendants move for summary judgment on the basis of qualified immunity and (except for Gail Young) for lack of direct involvement in any constitutional violation.

Substantive due process claims are of two types.  "The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal

statute other than procedural claims under 'the Fourteenth Amendment *simpliciter*."  *Mertik*, 983

F2d at 1367 (citations omitted).  The second type is "directed at official acts which may not

occur regardless of the procedural safeguards accompanying them."  *Id.*   The Second Claim

alleges the second type of substantive due process claim.

Substantive due process under the Fourteenth Amendment "forbids the government from

depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or

'interferes with rights implicit in the concept of ordered liberty.'"  *Nunez v. City of Los Angeles*,

147 F3d 867, 871 (9th Cir 1998), *quoting United States v. Salerno*, 481 US 739, 746 (1987).  As a

threshold matter, when making a substantive due process claim, the plaintiff must show a

"government deprivation of life, liberty, or property."  *Id* at 871 (citations omitted).  Whether

Herberg had a liberty interest that was deprived by the government depends on satisfying the

stigma plus factors, a question which, as discussed above, cannot be resolved at this stage

because of genuine issues of material fact.

Assuming that a protected liberty interest exists, the next question is whether its

deprivation "shocks the conscience."  The "shocks the conscience" test was applied in *Rochin v.

People of California*, 342 US 165, 172 (1952) in a police seizure case.  *Rochin* was later

overruled by *Graham v. Connor*, 490 US 386, 395 (1989), which held that all claims of

excessive force on the part of law enforcement in the course of an arrest, investigatory stop or

other seizure should be analyzed under the Fourth Amendment rather than under a substantive

due process approach.  However, the 'shocks the conscience' test survived in other contexts, and

courts, including the Supreme Court in *County of Sacramento v. Lewis*, 523 US 823, 834-35

(1998), continued to look to such earlier law enforcement cases for guidance on the application of the 'shock the conscience' test. This court will do the same.

Courts have found a deprivation shocks the conscience when it is so egregious that it is "bound to offend even hardened sensibilities." *See Rochin*, 342 US at 172 (the forcible extraction of one's stomach contents shocked the conscience); *City of Revere v. Mass. Gen. Hospital*, 463 US 239, 244 (1983) (interpreted by *County of Sacramento*, 523 US at 834, to hold that deliberate indifference to the medical needs of pretrial detainees shocked the conscience, *Id*, 523 US at 834); *Black v. Stephens*, 662 F2d 181, 188-89 (3rd Cir 1981), *cert denied*, 455 US 1008 (1982), *rehearing denied* 456 US 950 (1982) (pointing a gun at the head of plaintiff while he was being arrested, with his wife directly in the line of fire, shocks the conscience).

In comparison, Herberg's allegations, if true, do not arise to the level of shocking the conscience. Therefore, even if the jury finds a constitutionally protected interest, its deprivation does not arise to the level of a substantive due process claim, and defendants' motion for summary judgment against the Second Claim should be granted.

## III. Third, Fourth and Fifth Claim - Defamation and Slander *Per Se*

Herberg's Third, Fourth and Fifth Claims are directed only against the District. The Third Claim alleges that certain representations made by the District in the July 29, 2003 press release were false and defamatory *per se* because they implied that Herberg "lacked competency, was untrustworthy, and failed to follow fiscal policy." *Amended Complaint, ¶¶ 33-34*. The Fourth Claim alleges that between May 2003 and July 29, 2003, the District provided false and misleading information to THE OREGONIAN about Herberg, while failing to disclose all the information necessary for the reporter to understand the expenses, policies and directives

regarding expenses. *Id*, ¶¶ *37-38*. Herberg contends that the information was false and

defamatory *per se* because it implied that he "had committed illegal acts or lacked competency,

was untrustworthy and failed to follow fiscal policy and implied a lack of honesty and

trustworthiness in financial matters." *Id, ¶ 39.* The Fifth Claim also alleges defamation based on

the District publishing to TKW "incomplete, false and misleading information regarding

expenditures incurred by or authorized" by Herberg. *Id, ¶ 42.*

     The District asserts that all the statements in question were made in the pursuit of the

District's governmental function and, therefore, are absolutely privileged or conditionally

privileged. Alternatively, the District argues that even if no privilege applies to the

communications at issue, Herberg cannot show a genuine dispute of fact as to the elements of the

tort of defamation.

    **A.**  **<u>Legal Standard</u>**

     To establish a claim for defamation under Oregon law, the plaintiff must prove that the

statement is both "false" and "defamatory." *Reesman v. Highfill*, 327 Or 597, 603-04, 965 P2d

1030, 1034 (1998) (citations omitted). Furthermore, the defamatory statement must be about the

plaintiff, and "[p]ublication or communication of the defamatory statement is an essential

element of an action for defamation." *Wallulis v. Dymowski*, 323 Or 337, 343, 918 P2d 755, 758

(1996) (*en banc*) (citations omitted).

     A defamatory statement is one that would subject another to "hatred, contempt or ridicule

. . . (or) tend to diminish the esteem, respect, goodwill or confidence in which each is held or to

excite adverse, derogatory or unpleasant feelings or opinions against them." *King v.*

*Menolascino*, 276 Or 501, 503-04, 555 P2d 442, 443 (1976), *citing Farnsworth v. Hyde*, 266 Or

236, 238, 512 P2d 1002, 1003 (1973). This includes "[a] statement falsely ascribing to a person characteristics or conduct that would adversely affect his fitness for his occupation or profession." *Bock v. Zittenfield*, 66 Or App 97, 100, 672 P2d 1237, 1239 (1984), *review denied*, 296 Or 486, 677 P2d 702 (1984). Courts look at the context in which the communications were made. *Reesman,* 327 Or at 604, 965 P2d at 1034 (citations omitted). Even if a communication is not defamatory on its face, it may still be deemed defamatory if a reasonable person could draw a defamatory inference from it, a so-called "defamation by implication." *Id* (citations omitted). However, in a claim of defamation by implication, "the link between the communication and the defamatory inference must not be 'too tenuous.'" *Id*, *citing King*, 276 Or at 504, 555 P2d at 443. In other words, the inference must be "reasonable." *Reesman*, 327 Or at 604, 965 P2d at 1034 (citations omitted).

A plaintiff claiming defamation concerning his or her conduct, fitness or role as a public official must prove by clear and convincing evidence that defendant acted with actual malice, *i.e.* "either knowing that the charges that he made were false or with reckless disregard of their truth or falsity." *Victoria v. Blanc*, 168 Or App 586, 589, 7 P3d 668, 670 (2000), *citing New York Times Co. v. Sullivan*, 376 US 254 (1964). A public official is one whose position was such that "the public has an independent interest in the qualifications of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Id*, 168 Or App at 590, 7 P3d at 670, *citing Rosenblatt v. Baer*, 383 US 75, 86 (1966). Former employees continue to be "public officials" for purposes of making defamation claims if there is still a matter of public interest. *Rosenblatt*, 383 US at 87, n14.

As a superintendent overseeing 20 local school districts with 107,000 students, Herberg was a public official and the allegedly defamatory statements all pertain to actions he took in his official capacity. Therefore, Herberg must prove the District acted with actual malice.

Oregon law recognizes two privileges as defenses to defamation: an absolute privilege, which bars a claim for defamation, and a qualified privilege. *Wallulis*, 323 Or at 347-48, 918 P2d at 760. A qualified privilege "'does not bar the action, but requires [the] plaintiff to prove that the defendant abused the privileged occasion, in order to recover from the defendant." *Id*, 323 Or at 348, 918 P2d at 760-761 (citations omitted). Should the District officials successfully invoke absolute or qualified privilege, then the District would also be immune. *See* ORS 30.265(2) (2005) (every public body is immune from liability for acts of its employees where the employees are immune from liability).

**B. Whether the Statements are Defamatory**

**1. July 23, 2003 Press Release (Third Claim)**

The July 29, 2003 press release read as a whole could be defamatory. A reasonable person could interpret the press release to accuse Herberg of lacking competency, being untrustworthy and failing to follow District policy in his credit card and travel expenses, charges that Herberg considers false. Contrary evidence offered by Herberg shows he had similar spending patterns to other District officials and followed District policy, thus creating a genuine dispute regarding the truthfulness of the press release.

**2. Media Communications (Fourth Claim)**

Herberg also contends that the information provided by the District to THE OREGONIAN between April and July 29, 2003 about Herberg was false and defamatory *per se* because it

implied that he had committed illegal acts or lacked competency, was untrustworthy and failed to follow fiscal policy, charges which he vehemently denies. Whether the information the District provided to Parker was a defamatory communication is difficult to determine, partly because the record does not clearly define what information was provided to her.

The record reveals that Parker made her first public records request on May 6, 2003, after she had already been to the District's office to review records and spoken with Moore. In that request she asked to receive a list of all administrators and board members who drive District-owned vehicles and/or use District credit cards. She also requested a list of all administrators and Board members who traveled out-of-district in the last two years, with destination and reason for traveling. Moore did not respond to Parker regarding this requested information, and Collier did not remember seeing the Board members' travel and reimbursement records in the documents provided to Parker. Viewing the facts in the light most favorable to Herberg, the District provided Parker with incomplete information.

Herberg argues that the communication of selected and limited information to Parker was defamatory because, when published, it implied that Herberg had misappropriated public funds and resources. This court is persuaded that Parker based her article on the information provided to her by the District, and for the purposes of this motion, that information was incomplete and could be read as implying Herberg had misused public funds.

### 3. TKW Report (Fifth Claim)

The information provided to TKW also qualifies as a defamatory communication. It included statements that the District had an unwritten policy of following IRS *per diem* hotel guidelines, which, coupled with an incomplete list of Herberg's travel expenses, can lead a

reasonable person to conclude that Herberg did not follow district policy and engaged in lavish spending patterns.  However, the District did not follow IRS *per diem* hotel guidelines, but instead allowed its employees to stay at higher conference rates.  Moreover, Herberg submits evidence that some of his expenses actually covered other District employees' expenses and should not have been only attributed to him.  There are clearly material factual disputes regarding the falsity of the statements to TKW.

### C.  <u>Whether the Statements were Published</u>

There is no disagreement that all the allegedly defamatory statements were about Herberg and were published by the District.  A statement is published when it is shown to someone other than the person defamed.  "In general, a statement is published when it is communicated to a third party."  *Wallulis*, 323 Or at 343, 918 P2d at 758 (citations omitted).

### D.  <u>Whether the District Acted with Actual Malice</u>

Herberg alleges the District knew the falsity of, or acted with reckless disregard that, the information provided to THE OREGONIAN and TKW and contained in the July 29, 2003 press release was either false or omitted material information that was necessary to make the information complete, such as comparable expenses of the Board and District administrators.  The District responds that Herberg has cited no evidence to support his argument that the District acted with actual malice.

The "reckless disregard" standard has been defined as a "high degree of awareness of probable falsity."  *St. Amant v. Thompson*, 390 US 727, 731 (1968).  The defendant must have serious doubts as to the truth of its publication in order to be subject to liability.  *Id; also see Newton v. National Broad. Co., Inc.*, 830 F2d 662, 668 (9th Cir 1990), *cert denied*, 502 US 866

(1991) (citations omitted).  Evidence that a defendant purposefully avoided the truth may be

sufficient to support a finding of actual malice.  *Harte-Hanks Communications v. Connaughton*,

491 US 657, 692 (1989).

## 1. <u>July 29, 2003 Press Release (Third Claim)</u>

The July 29, 2003 press release, published just one day before Parker's article, attempted

to cast the spotlight on Herberg, do damage control, and disassociate the Board from any

questions about expenditures by narrowing the focus to "questions [that] relate primarily to the

credit card use of the District's former Chief Executive Officer during the past four years."  As

argued by Herberg, a reasonable person could conclude that the District intentionally drafted the

paragraphs questioning Herberg's credit card use and expressing the Board's concern along with

the paragraph about Herberg's termination, in order to imply the termination was related to the

questionable credit card use.  Thus, a genuine issue of material fact has been established with

regard to the District's actual malice in drafting the July 29, 2003 press release.

## 2. <u>Media Communications (Fourth Claim)</u>

At oral argument, Herberg contended that the District's selective and incomplete

communications with Parker showed actual malice because the District either knew or should

have known that without the ability to compare Herberg's travel and credit card documents to

those of the other administrators and Board members, one could conclude that Herberg was

fiscally irresponsible and untrustworthy.  Parker's request for the other administrators' and

Board members' travel documents and credit card use, viewed in the light most favorable to the

non-moving party, shows Parker was interested in broadening her investigation to include the

spending patterns of all administrators and Board members in the District.  Herberg argues that

by not providing this information,[3] the District administrators and Board members provided Parker with flawed information in order to put the spotlight on Herberg and to protect their own similar spending patterns from the public's critical eye.  In fact, Herberg points to certain travel expenses that Parker's July 30, 2003 article highlighted, which, coupled with the other administrators' and Board members' travel records, would have led one to reach a different conclusion, either implicating those District administrators and Board members in the spending scandal or exculpating Herberg.  *Herberg's Memorandum in Opposition to Defendants' Motion for Summary Judgment, pp. 4-7.*  In view of such evidence, this court concludes that a genuine issue of material fact exists as to whether the District's communications with Parker were in reckless disregard of their misleading or false nature.

### 3.  TKW Report (Fifth Claim)

There is evidence that the TKW report contained an erroneous conclusion.  Based on conversations with District administrators Jones, Collier and Nancy Young, TKW "determined the District had an unwritten policy that specified the District incurred [sic] charges for per diem and hotel charges would be based upon Internal Revenue Service guidelines for specific cities." *Ex. 9, pp. 1-2.*  This conclusion was false and District administrators knew or should have known it was false.  The Board was to review the draft TKW report, and Jones and Collier did review it.

---

[3] The evidence supporting the allegation that the requested documents were not provided includes: Moore's response email, which promised to provide the other requested information but was silent about the request about the administrators' and the board members' spending patterns (*Ex. 97*); Collier's deposition statement that he reviewed the documents provided to Parker and does not remember seeing the board members' travel and reimbursement records in the materials (*Collier Depo., pp. 54-57*); and proof that when Herberg requested to view these records during discovery, some were not obtained by the District from third parties and vendors until February 2004 (*Exs. 66 & 168, p.2, Gail Young Depo., p. 236; Moore Depo., pp. 221-22).*

Based on this evidence, a finder of fact could reasonably conclude that Jones, Collier and Nancy Young gave TKW false statements.

### E. Whether the District has an Absolute Privilege

Even if all the elements of a defamation claim are met, an absolute privilege bars a claim for defamation. *Wallulis*, 323 Or at 347, 918 P2d at 760 (citations omitted). In the past, Oregon recognized only a few fact patterns applying the absolute privilege which are "practically limited to legislative and judicial proceedings and other acts of state." *Grubb v. Johnson et al*, 205 Or 624, 631, 289 P2d 1067, 1070 (1955). The situations in which Oregon courts have recognized absolute privilege were categorized in *Wallulis* as "statements made by parties to judicial proceedings," "publications that are consented to," and "statements required by statute." *Id*, 323 Or at 348-49, 918 P2d at 761.

Oregon has extended the absolute privilege to executive officers who make allegedly defamatory statements in the course of performing their official duties "because the public interest in 'fearless action on the part of public officers' outweighs the interests of persons who might be damaged by those actions." *Johnson v. Brown*, 193 Or App 375, 384, 91 P3d 741, 746 (2004), *decision clarified on reconsideration* 194 Or App 486, 95 P3d 235 (2004), *citing Shearer v. Lambert*, 274 Or 449, 453, 547 P2d 98, 101 (1976). The absolute privilege also applies to "subordinate legislative bodies including . . . school boards, and special service districts." *Shearer*, 274 Or at 454, n7, 547 P2d at 101, *citing Noble v. Ternyik*, 273 Or 39, 43, 539 P2d 658, 661 (1975). For the purpose of the absolute privilege, this court finds that the District's administrators and Board members are executive officers.

In considering whether absolute privilege applies, the official's motivation is not considered. The Supreme Court "clearly held that a false and damaging publication, the issuance of which was otherwise within the official's authority, was not itself actionable and would not become so by being issued maliciously." *Butz v. Economou*, 438 US 478, 488 (1978) (citations omitted).

Executive officers are precluded from asserting the absolute privilege if the alleged defamation did not occur in the course of their official duties, which depends on whether the official was authorized or required to make the statement. *Shearer,* 274 Or at 455, 547 P2d at 101-102. *Shearer* held that whether an official is authorized or required to make the statement is a question for the jury. *Id.* However, the Oregon Court of Appeals has granted summary judgment to defendants after finding sufficient evidence in the record that the allegedly defamatory statement was made in the course of the speaker's official duties. In *Chamberlain v. City of Portland*, 184 Or App 487, 56 P3d 497 (2002), the court applied an absolute privilege on summary judgment to a statement made by a police officer in a report she was required to prepare by her supervisor. In *Johnson*, the court applied an absolute privilege on summary judgment to a defamatory statement made by an employee as part of a work investigation she was required to participate in fully and openly.

Furthermore, in *Fender v. City of Oregon City,* 811 F Supp 554 (D Or 1993), where the jury had found the mayor was not authorized to make a public statement about the plaintiff's job performance, the court disagreed and held that absolute privilege applied. Unlike here, however, *Fender* had the benefit of a fully developed record from trial. *Fender* found that although the mayor was not required by law or by direction of his superiors to make the statement, "that is not

controlling in the case of an official of policy-making rank." *Id* at 558. *Fender* relied on *Barr v. Matteo*, 360 US 565, 575 (1959) (plurality opinion), *rehearing denied* 361 US 855 (1959), which held that the absolute privilege applies to mandatory duties at all levels of government and discretionary acts "at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Barr* involved an allegedly defamatory statement issued by the acting director of an "important agency of government" in a press release, announcing his intention to suspend employees for certain conduct in response to charges in the Senate questioning the integrity of the agency's internal operations. *Fender* and *Barr* thus offer a test for following test to interpret whether a public official is authorized to take certain actions: the higher the level of government, the broader the discretion to which the absolute privilege applies.

At issue here is whether defendants were required or authorized to make the three types of statements in question: disclosing information to THE OREGONIAN, publishing the July 29, 2003 press release and giving information to TKW. *Schroeder v. Poage*, 75 Or App 671, 707 P2d 1240 (1985), *review denied*, 300 Or 451 (1985), provides a helpful framework to making that determination. In that case, a member of a city counsel sued the mayor for libel based on publication of a letter requesting the counsel member's resignation. Comparing the letter to other evidence in the record, the trial court found that the mayor had written the letter in the course of his official duties because: (1) the letter consistently conveyed the mayor's concern about the conduct of a city official, and that concern was legitimately related to the office of mayor; (2) the letter was "published in a manner reasonably calculated to resolve the concerns about the city official's conduct;" (3) the mayor was authorized to disclose the letter because it

was a public record under ORS 244.300, having been sent to the Ethics Commission; and (4) the letter "provided the public with information concerning the conduct of city affairs." *Id,* 75 Or App at 675 n1, 707 P2d at 1243 (citations omitted). The Oregon Court of Appeals affirmed, finding no issue of fact because the mayor drafted the letter in his office at City Hall, signed the letter in his capacity as mayor, the letter involved no "personal thing" despite his deposition and the mayor's purpose in publishing the letter is irrelevant. *Id*, 75 Or App at 676-77, 707 P2d at 1243.

### 1. July 29, 2003 Press Release (Third Claim)

The July 29, 2003 press release conveys concern about possible misconduct by a public official and attempts to resolve that concern. It fits within the District's duty of accountability to the public in responding to questions regarding possible misuse of funds, relating mostly to the alleged misuse by Herberg. Although it does not directly accuse Herberg of anything, it announces an intention to revamp the system of overseeing expenses and the district rules and regulations regarding expenses. At the time the press release was published, the information was not public and did not become well-known until the next day due to Parker's July 30, 2003 article.

On the other hand, viewing the facts in the light most favorably to Herberg, the press release used finger-pointing and drafting techniques to narrow the public inquiry to just one person, namely Herberg. It attacked the person instead of tackling the allegedly larger problem. Because the press release was arguably not reasonably calculated to address the District's purported concerns, this court finds a genuine issue of material fact as to whether the District was either required or authorized to publish the July 29, 2003 press release.

## 2. <u>Media Communications (Fourth Claim)</u>

With respect to whether statements made to THE OREGONIAN between April and June 2003 were required or authorized, the District argues that it was required by statute to respond to requests by the media under Oregon's public records law. "Historically, Oregon courts have looked to the *Restatement of Torts* for guidance concerning defamatory torts." *Morrow v. II Morrow, Inc*., 139 Or App 212, 218-19, 911 P2d 964, 967-68 (1996), *review denied*, 323 Or 158, 916 P2d 312 (1996). According to the RESTATEMENT (SECOND) OF TORTS, § 592A (1977), "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it." *Also see Christensen v. Marvin*, 273 Or 97, 539 P2d 1082 (1975) (finding defamatory statements absolutely privileged because a statue required defendant board member to publish the reasons for their failure to rehire the plaintiff).

The District is a "public body" within the meaning of Oregon's public records law. ORS 192.410(3) (2004). A "public record" includes "any writing containing information relating to the conduct of the public's business." ORS 192.410(4) (2004). Under that statute, "[e]very person has a right to inspect any public record of a public body in this state. . ." ORS 192.420(1) (2004). Therefore, Herberg's travel records and expense reports, as well as the TKW report, were public records that the District was required to provide in response to Parker's request.

Although Parker made no official request for public records, District officials arguably were acting within their official duty of transparency by answering her unofficial request and providing her with certain public records. However, the alleged defamation comes not from providing public records, but from providing incomplete public records. Parker requested to see not only Herberg's expense records, but also the expense records for all the administrators and

Board members who held a District credit card or traveled out-of-state on District business. Based on the current record, the District did not fully satisfy Parker's request. Under *Schroeder*, the inquiry returns to the reasonableness of the District's response to address the concern. Answering an unofficial request for public records fueled by concern for District spending by giving painfully incomplete, misleading information is not a reasonable manner of responding to the concern.

The District also argues that defamation requires an actual statement to be actionable, citing *Bahr v. Statesman Journal*, 51 Or App 177, 180, 624 P2d 664, 666 (1981), *rehearing denied* 291 Or 118, 631 P2d 341 (1981). In *Bahr*, a candidate for county commissioner sued a newspaper and its employee for defamation. The newspaper revealed that the candidate had been convicted of embezzlement and had lied in denying the conviction was true, despite the fact that the lie was authorized under an expungement statute. The plaintiff admitted the conviction, but argued that he was defamed by the manner in which the information about the conviction was presented in the newspaper which portrayed him as a liar by not adding that the conviction had been expunged and that he could legally answer as he did. However, the plaintiff admitted the statements were true, and the expungement statute did not impose any duty those who are aware of the conviction to pretend it does not exist. Since truth was a complete defense, the court found in favor of the defendants. Given that *Bahr* based its decision on the defense of truth, not on the defense of absolute privilege, it is distinguishable from the present case.

Furthermore, this court finds persuasive the reasoning in *Boice v. Unisys Corp.*, 50 F3d 1145 (2nd Cir 1995). In *Boice*, a company that produced false expense vouchers to the Inspector General pursuant to a subpoena was sued for defamation by the public employees who were

falsely reported to be the employees. The court held that the absolute privilege applied if "the disclosure was compelled by subpoena," "the disclosure materially responded to the subpoena," and "the person did not set the investigation in motion, or otherwise manipulate the investigative process to promote the libel." *Id* at 1149.

The present case involves disclosure compelled by a subpoena. In addition, questions of fact surround whether the District officials manipulated the investigative process by ignoring Parker's request for all pertinent records, setting the investigation in motion by creating the rumors about Herberg's spending patterns, feeding these rumors in the July 29, 2003 press release, ordering an investigation of only Herberg's spending, providing incomplete and sometimes false information to TKW while it was conducting its procedure, and failing to correct that information before or after the report was released to the public.

### 3. TKW Report (Fifth Claim)

To TKW report states a concern about the actions of a public official and responds to that concern. Whether the response, regardless of its motivation, was in a manner reasonably calculated to resolve the concerns about that official's conduct is again a question of fact. Viewing the facts in the light most favorably to Herberg, the District's decision to hire TKW to prepare a quasi-audit and providing false or incomplete information to TKW was not reasonably calculated to resolve the concerns about Herberg's spending.

### 4. Conclusion

In summary, genuine questions of fact exist as to whether the allegedly defamatory statements were either required or authorized and thus within the discharge of the District's

official duties.  Unless those factual issues are resolved in the District's favor, no absolute privilege applies.

### F.  Whether the District has a Conditional Privilege

A statement is conditionally privileged if it was made to protect the interests of defendants, to protect the interests of the plaintiff's employer, or on a subject of mutual concern to defendant and the person to whom the statement was made.  *Wattenburg v. United Med. Labs.*, 269 Or 377, 380, 525 P2d 113, 114 (1974).  To maintain a defamation action based on a statement subject to a conditional (or qualified) privilege, a plaintiff must provide proof that the defendant abused the privileged occasion.  *Bank of Oregon v. Indep. News*, 298 Or 434, 437-38, 693 P2d 35, 38-39, *cert denied*, 474 US 826 (1985).  A conditional privilege is lost if the statement is made maliciously.  *Wattenburg*, 269 Or at 379, 525 P2d at 114.  A statement is made maliciously if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than the one for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose.  *Lund v. Arbonne Int'l, Inc.*, 132 Or App 87, 95-96, 887 P2d 817, 823 (1994).  The determination of whether a conditional privilege has been abused is generally a jury question.  *Wheeler v. Green*, 286 Or 99, 104, 593 P2d 777, 781 (1979).

Even if the District can invoke a conditional privilege, the privilege is lost if the statement was made maliciously.  As discussed above, this court has found genuine issues of

material fact as to whether District officials acted with actual malice.  This is a question for the jury to resolve.

**G.  Conclusion**

Due to a genuine issue of material fact as to whether the statements were defamatory and made with actual malice, as well as whether an absolute or conditional privilege applies, the District's motion for summary judgment as to the Third, Fourth and Fifth Claims should be denied.

**IV.  Sixth Claim - False Light**

Herberg's Sixth Claim alleges that the District, through the July 29, 2003 press release, as well as the information provided to or concealed from THE OREGONIAN and TKW, "directed publicity to the expenditures incurred or authorized by [Herberg] in a manner that placed [him] in a false light before the public." *Amended Complaint, ¶ 45.*  Herberg further alleges that the District either "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [he] would be placed." *Id, ¶ 46.*

The District argues that if the statements at issue were absolutely or conditionally privileged, then the "false light" statements also were privileged.  Alternatively, the District argues that Herberg cannot meet his burden of proving the District either had knowledge as to the falsity of the publicized matter or acted with reckless disregard of the false light into which the plaintiff would be put.

**A.  Legal Standard**

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if: (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had

knowledge of or acted in reckless disregard as to the falsity of the
publicized matter and the false light in which the other would be placed.

*Dean v. Guard Publ'g Co.*, 73 Or App 656, 659, 699 P2d 1158, 1160 (1985), *quoting* the

RESTATEMENT (SECOND) OF TORTS, § 652E.  An absolute privilege against liability for

defamation also extends to claims of false light.  *See Lee v. Nash*, 65 Or App 538, 542, 671 P2d

703, 706 (1983), *review denied*, 296 Or 253 (1984).

///

**B.  Analysis**

The District does not dispute whether the statements placed Herberg in a false light,

whether they were given sufficient publicity and whether they would be highly offensive to a

reasonable person.  Instead, it contests whether the District officials either had knowledge or

acted in reckless disregard as to the falsity of the publicized matter and the false light in which

Herberg would be placed.

The elements of a false light claim in Oregon were explained as follows:

One who gives publicity to a matter concerning another that places the
other before the public in a false light is subject to liability to the other for
invasion of his privacy, if "(a) the false light in which the other was placed
would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the
falsity of the publicized matter and the false light in which the other would
be placed."

*Philadelphia Romanian Penticostal Church*, 154 Or App 465, 474, 962 P2d 711, 716, *rev*

*denied,* 327 Or 621, 971 P2d 413 (1998)*, citing Morrow*, 139 Or App at 220, 911 P2d at 964.

The standard as to knowledge or recklessness is identical to the standard of actual malice

in the defamation claim.  Having already found that genuine issues of material fact exist as to

whether the District representatives made the statements with actual malice, this question must

44 - FINDINGS AND RECOMMENDATION

be determined at trial. Moreover, the current record does not support a finding of absolute privilege as a matter of law on the defamation claims and the same is true for the false light claim. Thus, the motion for summary judgment on the Sixth Claim should be denied.

## RECOMMENDATION

Based on the foregoing, defendants' Motion for Summary Judgment (docket #28) should be GRANTED as to the Second Claim and DENIED as to all the remaining claims.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due December 23, 2005. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 6th day of December, 2005.

/s/ Janice M. Stewart

Janice M. Stewart
United States Magistrate Judge